## Dawson, et al. v. Smith, et al.

(Decided December 1, 1922.)

### Appeal from Nelson Circuit Court.

1. Work and Labor—Services—Implied Contract.—Where parties sustain toward each other a family or domestic relationship, and, occupying the same home, render mutual services for the benefit of all, an implied contract will not be raised in favor of any of them against any of the others for compensation for such service, and to authorize a recovery therefor an express contract must be proved.

2. Work and Labor—Services—Such family relationship held not to exist where a man lived for years in the home of another to whom he was not related in any way without performing any service for the common good.

3. Work and Labor—Services—Contract for Payment of.—An express contract to pay for board, lodging and the keep of a horse held to have been established where the parties were not related and a family relationship did not exist, by proof of facts which clearly show that the parties expected and understood that compensation would be made therefor at a fixed time and in a particular way.

4. Work and Labor—Services—Implied Contracts.—Whether, when the parties are not near relatives, the presumption is for or against an implied contract, as well as whether or not there was an express contract to pay for services rendered, depends upon the peculiar facts and circumstances of each case and the inferences fairly deducible therefrom, rather than upon any hard and fast general rule.

5. Work and Labor—Services—Limitation of Actions.—When under the terms of the contract the claims are not payable until after the death of the one for whom the services were rendered, a cause of action therefor did not sooner accrue and the statutes of limitation are not a bar thereto.

OSSO W. STANLEY and JOHN D. CARROLL for appellants.

KELLEY & KELLEY and J. S. BARLOW for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

John A. Stipes died intestate, a resident of Nelson county, in April, 1919. He had no near relatives and was left an orphan when but a child. He and Thomas Dawson, the father of appellants, formed a partnership when they were young men which lasted until the death of Dawson in February, 1901. Stipes was never married and made his home with Dawson from soon after the

latter's marriage until his death, upon one of the several farms they owned and operated as partners. Dawson left a widow and eight children, the oldest of whom were the appellants, Guy M. and C. O., then about 20 and 18 years of age respectively. Stipes continued to live in the home of the Dawsons after Dawson's death, and until 1903, when the oldest boy, Guy, married and began housekeeping; Stipes then went to live with him and lived with him until in 1911, when he moved to town, at which time C. O. Dawson married and moved into the house vacated by his brother, and Stipes lived with him until his death.

During practically all of the time from 1903 until his death, Stipes had a horse which was fed and cared for by the Dawson boys.

About a year after the death of the elder Dawson, and in the division of the partnership property, there were allotted to Stipes three tracts of land containing 36, 86 and 154 acres. Soon thereafter he conveyed the 36-acre tract to G. M. and C. O. Dawson, but required them to pay to their brothers and sisters the value of *pro rata* interests therein. There was at the time no residence upon this tract, but the Dawson brothers built one when Guy married, and it was in this home that Stipes lived first with G. M. Dawson and then with C. O. Dawson, during all of which time Guy M. and C. O. Dawson operated this farm, as well as the farm of about 200 acres allotted to Tom Dawson's heirs in the settlement of his partnership with Stipes, as partners under the firm name of "Dawson Brothers."

In this suit to settle Stipes' estate, G. M. Dawson filed a claim for his board and lodging from July, 1903, to December, 1910, at $20.00 a month, amounting to $1,800.00; C. O. Dawson filed a claim for board and lodging decedent from January, 1911, to April, 1919, at $20.00 a month, amounting to $1,980.00; and Dawson Brothers filed a claim for caring for and feeding decedent's horse the whole time at $10.00 a month, amounting to $1,740.00.

Upon exceptions filed thereto by the appellees, who are the heirs of the decedent, the claims were disallowed and the claimants have prosecuted this appeal from that judgment.

There is no dispute as to the rendition and value of the services, which were abundantly established, and the questions presented by this appeal are whether or not

an express agreement to pay therefor was established as alleged, and if not, whether an implied promise was either pleaded or proven.

The express contract alleged is that decedent agreed to pay claimants for their services by providing by will for the payment of same out of his estate after his death. If this contract was established by the proof, the claims should have been allowed, as is conceded by appellees.

It is an elementary doctrine of the law of contracts that whenever services are rendered and received an obligation to pay therefor will generally be presumed. 2 Parsons 46, 11 L. R. A. (N. S.) 874.

But it is as firmly established, as was said in Oliver, Gdn. v. Gardner, 192 Ky. 89, 232 S. W. 418, that: ''Where parties occupy towards each other a family or domestic relationship and where they occupy the same home and render mutual services for the benefit of all, there will be no implied contract raised in favor of any of them as against any of the others for compensation for such services. This rule not only applies to blood relatives but it likewise includes step-parents and stepchildren and other strangers in blood who occupy a family or domestic relationship toward each other.''

After citing authorities from this court and elsewhere supporting this statement of the exception to the general rule, we said:

''In such cases the law presumes the services claimed for were gratuitously rendered, and especially so where near blood relationship exists; and they will also be presumed to be so rendered where there exists no blood relationship upon the idea that the parties sustained to each other family or domestic relations analogous to that existing between partners in a partnership. The authorities cited, however, including the cases from this court, go no further than to deny a recovery upon an *implied* contract and to allow it in all cases where there is an *express* contract to pay for the services. Within this rule it is not essential that the proof should show a formal categorical promise by the one sought to be charged in order to create the 'express contract' upon which a recovery will be allowed, since in the language of this court in the Reynolds case, 'any facts that will constitute, or are equivalent to, such an agreement' will be sufficient to establish an express contract; and in the Turner case it was said, 'In such cases there must be proof either of

an express contract to pay or of such facts and circumstances as fairly show that both the party rendering the service and the one receiving it expected and understood that compensation would be made. (17 A. & E. Ency. 336; Reynolds v. Reynolds, 92 Ky. 556, 18 S. W. 517; Heck v. Heck, 10 Ky. L. R. 281 (Superior Court); Hurst v. Stanberry, MS. opinion, 1 Barbour's Digest, 392, 1855. For cases applying the above rules to the relationship of step-parents to stepchildren, and *vice versa*, see the annotations, *supra*, page 885. What are sufficient facts to show that the parties 'expected and understood that compensation would be made,' from which an express contract might be inferred, must be determined from the testimony in each case, and it must show something more than acknowledgment of gratitude on the part of the one receiving the services, and more than expressions of wish or desire that the party rendering them should be compensated or perhaps more than an indefinite intention to compensate for the services some time in the future, as was held in the Bishop case, *supra*."

Stipes was not related to the Dawsons by either blood or marriage, and they were under no sort of an obligation, either moral or legal, to give him a home. There is no evidence that they lived together as one family as a matter of mutual convenience, since there is no evidence that Stipes ever contributed anything toward household expenses or did any work for the claimants, either about the house or on the farm. He just lived first with one and then the other of appellants, for his own convenience and by their consent, and during all of this time they jointly fed and cared for his horse. He had an ample estate to have paid for anything he wanted, amounting at his death to approximately $22,000.00, while the two Dawson boys have but little property and are comparatively poor.

For all of these services he never paid appellants a cent, nor did he ever give them anything more than he gave to the other Dawson children, and as disclosed by the record he never gave anything to the Dawson children except the 36 acres of land hereinafter explained, and $2.00 apiece as a Christmas present one Christmas. Neither did appellants ever ask him to pay for same, upon which fact appellees place much stress; but this is easily explained by the fact that during all of this time

he was constantly telling his friends and associates—and of which appellants were informed—as well as appellants, that he had no relatives for whom he cared or that cared for him, and that he was going to make a will and compensate them for all they had done and were doing for him, and leave the balance of his property to the Dawson children.

The natural inference, it seems to us, from the failure to demand payment sooner for the services under the circumstances, is not that they were rendered gratuitously as appellees contend, but rather that they were rendered under agreement, as alleged by the claimants, that they were to be paid for out of the recipient's estate after his death, which furnishes the only reasonable explanation of the matter, since otherwise claimants were under neither a legal nor moral obligation so to do, and without which people do not ordinarily do such things.

Another very significant fact of particular potency, as we think, upon this inquiry is the so-called gift by decedent of the 36-acre tract of land to the Dawson children, coming as it did at the time he was about to leave the home of Mrs. Dawson and her children and go to live with Guy. Counsel for appellants insist this conveyance was not a mere gratuity but a payment by decedent for his board and the services that were rendered to him by Mrs. Dawson and her children for the time he lived with them following the death of Tom Dawson and until he went to live with Guy, a period of a little more than two years. Not only can it not be accounted for upon any other reasonable hypothesis, but this is in our judgment the only fair inference deducible therefrom. This fact alone, in our judgment, is not only strongly indicative that decedent both recognized his obligation and intended to pay generously for such services rendered him, but was also reasonably calculated to induce a belief upon the part of claimants that he would compensate them by will for their services, as he was saying he intended to do.

To say that services rendered and received under such circumstances, especially where the parties were not related in any way, were rendered or received as a mere gratuity, or that the conveyance of this land was prompted alone by impulses of generosity, is to ignore the facts and every reasonable inference to be drawn therefrom.

It is perfectly clear therefore, we think, that the services were rendered by the Dawsons and received by Stipes with the understanding and in the confident belief of both parties that they were to be paid for out of decedent's estate at his death. Counsel for appellees concede, and they could not do otherwise, that decedent fully intended, but simply neglected, to make a will providing therefor and devising the remainder of his property to the Dawson children. It is equally clear that the Dawson boys, in rendering these services for him, just as fully and most reasonably expected, and were led to believe by those statements, that he would do so; and there is no reason whatever to presume or believe that the Dawson boys would have rendered or did render these services gratuitously for one to whom they were under neither legal nor moral duty, or that he would have accepted or did accept same upon any such condition. Upon the other hand, if presumptions were to be indulged and control, they could be none other than such as support an implied contract, since this case clearly comes within the general rule rather than the exception thereto, *supra*. But in our judgment this evidence under the rule as quoted above from the Gardner case, and especially under the Reynolds and Turner cases therein referred to, proves the express contract alleged. Moreover each of those cases involved claims asserted where the presumption prevailed that they were rendered gratuitously, and the evidence had to overcome that presumption. But here the presumption is just the reverse and supports the claims. Manifestly such evidence as would be sufficient to overcome the legal presumption and prove an express contract in the one case, would be more than sufficient to support the contrary legal presumption in the other, and ample to prove an express contract.

Despite the inharmonious opinions of different courts, and sometimes of the same court upon some phases of the question, and much confusion due to the frequent failure to distinguish clearly between express and implied contracts, the authorities agree in holding that no hard and fast general rule can be laid down applicable to all cases of this kind, and that each case must depend upon its own peculiar facts and circumstances and the inferences reasonably and fairly deducible therefrom in order to determine, when the parties are not near relatives, whether the presumption is for or against an

implied contract, and also whether or not there was an express contract to pay for services rendered and received. In the determination of these ultimate questions, and affecting the weight to be attributed to the same facts in different cases, the relations of the parties —whether due to blood or marriage, or their manner of living together—as well as all the other circumstances attending the rendition of the services are potent factors.

Weighing all the facts and circumstances of this case, we are of the opinion that the only fair and reasonable inference therefrom is that the services involved were rendered by the Dawsons and accepted by Stipes with the understanding and agreement by the parties that they were to be paid for by Stipes out of his estate after his death, and that he would make a will providing therefor.

This conclusion is demanded, in our judgment, not only under the authorities, *supra,* but also under the principles announced or approved in the cases of Benge's Admr. v. Fonts, 163 Ky. 796, 174 S. W. 510, and Armstrong's Admr. v. Shannon, et al., 177 Ky. 547, 197 S. W. 950, upon which appellees rely, and where a family relationship for the mutual convenience of the parties was much more nearly approached than here, if indeed in those cases such a relationship did not exist.

As under the terms of the contract proven, the claims were not payable until after decedent's death, a cause of action therefor did not sooner accrue, and the statutes of limitation pleaded in bar thereof are not applicable.

It results therefore that the court erred in rejecting the claims, and the judgment is reversed with directions to allow them, and for proceedings consistent herewith.